```
                                          FILED
                            CLERK, U.S. DISTRICT COURT

                                 FEB 1 4 2008

                            CENTRAL DISTRICT OF CALIFORNIA
                            BY                      DEPUTY
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DEBORAH BUSS,                    )     No. CV 07-04738-CT
                                )
                Plaintiff,      )     OPINION AND ORDER
                                )
        v.                      )
                                )
MICHAEL J. ASTRUE,              )
Commissioner of                 )
Social Security,                )
                                )
                Defendant.      )
_____ )

        For the reasons set forth below, it is ordered that plaintiff's
motion for summary judgment be denied and judgment be entered in favor
of defendant Commissioner of Social Security ("the Commissioner")
because the Commissioner's decision is supported by substantial evidence
and is free from material legal error.

                        SUMMARY OF PROCEEDINGS

        On July 26, 2007, plaintiff, Deborah Buss ("plaintiff"), filed a
complaint seeking judicial review of the denial of benefits by the
Commissioner pursuant to the Social Security Act ("the Act").   The
parties filed a consent to proceed before the magistrate judge.   On
October 5, 2007, the Commissioner filed an answer to the complaint.   On
December 17, 2007, plaintiff filed a motion for summary judgment with a

memorandum of points and authorities in support.  On February 4, 2008, the Commissioner filed a brief in opposition.  [If plaintiff files a reply, insert information here _____].

## SUMMARY OF ADMINISTRATIVE RECORD

1.  Proceedings

On March 19, 2003, plaintiff filed an application for Supplemental Security Income ("SSI"), alleging disability since May 1, 1998, due to "anxiety, depression, poor failing immune system, lower back disc displacement, polycystic liver and kidney disease, obsessive compulsive, HBP [hypertension], glaucoma, diabetic, gout, asthma, allergies." (TR 22, 57-62).[1]  The application was denied initially and upon reconsideration.  (TR 43-51).  Following administrative proceedings, the case was remanded to the administrative law judge ("ALJ") for further evaluation of the opinion of plaintiff's treating physician.  (TR 22, 529-30, 657-59, 894).

Following remand, plaintiff, represented by an attorney, appeared and testified before the ALJ at a hearing held on August 16, 2006.  (TR 676-78, 687-97).  The ALJ also heard testimony from a vocational expert and a medical expert.  (TR 679-87, 697-701).  On September 23, 2006, the ALJ issued a decision that plaintiff was not disabled, as defined by the Act, and thus was not eligible for benefits.  (TR 19-32).

Plaintiff filed a request with the Social Security Appeals Council to review the ALJ's decision.  (TR 17-18).  On March 12, 2007, the request was denied.  (TR 8).  Accordingly, the ALJ's decision stands as

---

[1] "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

1  the final decision of the Commissioner. Plaintiff subsequently sought

2  judicial review in this court.

3       2.  Summary Of The Evidence

4       The ALJ's decision is attached as an exhibit to this opinion and

5  order, and materially summarizes the evidence in the case.

6                    PLAINTIFF'S CONTENTIONS

7       Plaintiff essentially contends she is entitled to benefits or

8  remand for further development of the record for the following reasons:

9  1.   The ALJ failed to provide legally sufficient reasons for rejecting

10      the opinions of treating physician Dr. Kamath and examining

11      physician Dr. Wind; and

12  2.  The ALJ erred by finding plaintiff's mental impairment to be non-

13      severe.

14                    STANDARD OF REVIEW

15      Under 42 U.S.C. § 405(g), this court reviews the Commissioner's

16  decision to determine if:  (1) the Commissioner's findings are supported

17  by substantial evidence; and, (2) the Commissioner used proper legal

18  standards.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

19  Substantial evidence means "more than a mere scintilla," Richardson v.

20  Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.

21  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

22      When the evidence can reasonably support either affirming or

23  reversing the Commissioner's conclusion, however, the court may not

24  substitute its judgment for that of the Commissioner.  Flaten v.

25  Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir.

26  1995).  The court has the authority to affirm, modify, or reverse the

27  Commissioner's decision "with or without remanding the cause for a

28

1  rehearing."   42 U.S.C. § 405(g).

2                          DISCUSSION

3    1.   The Sequential Evaluation

4        A person is "disabled" for the purpose of receiving Social Security

5   benefits if he or she is unable to "engage in any substantial gainful

6   activity by reason of any medically determinable physical or mental

7   impairment which can be expected to result in death or which has lasted

8   or can be expected to last for a continuous period of not less than 12

9   months."   42 U.S.C. § 423(d)(1)(A).

10       The Commissioner has established a five-step sequential evaluation

11  for determining whether a person is disabled.   First, it is determined

12  whether the person is engaged in "substantial gainful activity."   If so,

13  benefits are denied.

14       Second, if the person is not so engaged, it is determined whether

15  the person has a medically severe impairment or combination of

16  impairments.   If the person does not have a severe impairment or

17  combination of impairments, benefits are denied.

18       Third, if the person has a severe impairment, it is determined

19  whether the impairment meets or equals one of a number of "listed

20  impairments."   If the impairment meets or equals a "listed impairment,"

21  the person is conclusively presumed to be disabled.

22       Fourth, if the impairment does not meet or equal a "listed

23  impairment," it is determined whether the impairment prevents the person

24  from performing past relevant work.   If the person can perform past

25  relevant work, benefits are denied.

26       Fifth, if the person cannot perform past relevant work, the burden

27  shifts to the Commissioner to show that the person is able to perform

28
                                    4

1  other kinds of work.  The person is entitled to benefits only if the
2  person is unable to perform other work.  20 C.F.R. § 416.920; Bowen v.
3  Yuckert, 482 U.S. 137, 140-42 (1987).

4      2.  Issues

5          A.  Physicians' Opinions (Issue 1)

6      Plaintiff contends that the ALJ erred by rejecting the opinions of
7  treating physician Dr. Kamath and examining physician Dr. Wind.  While
8  acknowledging that these physicians' opinions were contradicted by other
9  doctors, petitioner asserts that the ALJ failed to provide legally
10 sufficient reasons for rejecting their opinions.

11     The opinion of a treating physician "is given deference because 'he
12 is employed to cure and has a greater opportunity to know and observe
13 the patient as an individual.'"  Morgan v. Commissioner of Social
14 Security Administration, 169 F.3d 595, 600 (9th Cir. 1999) (citation
15 omitted).   "The  treating  physician's  opinion  is  not,  however,
16 necessarily conclusive as to either a physical condition or the ultimate
17 issue of disability."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.
18 1989).  The weight given a treating physician's opinion depends, in
19 part, on whether it is supported by sufficient medical data and is
20 consistent with other evidence in the record.   See 20 C.F.R. §§
21 404.1527, 416.927.

22     "[T]he ALJ may disregard the opinion of a treating physician,
23 whether or not controverted. . . ."  Andrews v. Shalala, 53 F.3d 1035,
24 1041 (9th Cir. 1995) (citation omitted).  To reject the uncontroverted
25 opinion of the plaintiff's treating physician, the ALJ must present
26 clear and convincing reasons for doing so.  Id.  Even if the treating
27 physician's opinion is contradicted by other doctors, the Commissioner

28

5

may not reject the opinion without providing "specific and legitimate reasons" for doing so which are supported by substantial evidence. Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (citation omitted). When evaluating conflicting medical opinions, "an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted). "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole," or "by objective medical findings." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004).

The opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted opinion of an examining physician may be rejected only if the Commissioner provides clear and convincing reasons for rejecting it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001). The opinion of an examining physician constitutes substantial evidence, and may be relied upon instead of the contradictory opinion of a treating physician, where it is based on independent clinical findings that differ from those of the treating physician. Andrews v. Shalala, 53 F.3d at 1041. "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, [citation] or (2) findings based on objective medical tests that the treating physician has not herself considered [citation]." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

The opinion of a nontreating, nonexamining physician can amount to

1   substantial evidence as long as it is supported by other evidence in the

2   record, such as the opinions of other examining and consulting

3   physicians, which are in turn based on independent clinical findings.

4   Andrews v. Shalala, 53 F.3d at 1041.  An ALJ can reject the opinion of

5   an examining physician and adopt the contradictory opinion of a

6   nonexamining physician only for specific and legitimate reasons that are

7   supported by substantial evidence in the record.  Moore v. Commissioner

8   of Social Security Administration, 278 F.3d 920, 924 (9th Cir. 2002).

9       Here, the record reflects that treating physician Dr. Kamath became

10  plaintiff's primary care physician in January 2002.   Dr. Kamath

11  submitted terse notes written on prescription pads, stating that

12  plaintiff was "completely and permanently disabled."  (TR 432, 440).

13  Dr. Kamath also submitted multiple impairment (4/05, 7/06) and residual

14  functional capacity (12/04) assessments, in which she opined that

15  plaintiff had extreme limitations on her physical work-related

16  activities that would preclude competitive work.  (TR 483-87, 645-52,

17  850-57).

18      The ALJ gave Dr. Kamath's opinion "no weight" for multiple reasons.

19  (TR 27-28).   As the ALJ observed, "Dr. Kamath did not set forth any

20  disabling limitations and [her] assessments are not supported by her

21  treatment notes."  (TR 27).  The ALJ noted, for example, that Dr. Kamath

22  diagnosed plaintiff with "extensive" degenerative joint disease

23  (osteoarthritis) without testing.  (TR 27, 420, 441, 645-46, 850).  Yet

24  when range of motion tests, motor strength tests, and grip strength

25  tests were performed by Dr. Singh, the board certified internal medicine

26  M.D. who examined plaintiff in a comprehensive internal medicine

27  evaluation, there were "no physical findings" indicative of arthritis.

28

1 (TR 369-71).   Additionally, a radiologist's reports on x-rays of
2 plaintiff's hip and shoulder were negative.   (TR 421, 450).   The ALJ
3 also noted that Dr. Kamath diagnosed plaintiff with lumbar radiculopathy
4 without testing.   (TR 26, 483, 822).   Yet when other doctors performed
5 straight leg raising tests, nerve conduction velocity tests, and
6 electromyogram tests, plaintiff was shown not to have lumbar
7 radiculopathy.   (TR 442-43, 860).   The ALJ's reason for rejecting Dr.
8 Kamath's opinion was a proper one.   See Batson v. Commissioner of Social
9 Security Administration, 359 F.3d at 1195 ("[A]n ALJ may discredit
10 treating physicians' opinions that are conclusory, brief, and
11 unsupported by the record as a whole," or "by objective medical
12 findings.").

13     The ALJ also rejected Dr. Kamath's opinion because in diagnosing
14 plaintiff and assessing plaintiff's limitations Dr. Kamath implicitly
15 relied upon plaintiff's self-reporting (as evidence of testing is
16 lacking).   The ALJ observed that "Dr. Kamath's treating notes are simply
17 recitations of [plaintiff's] subjective allegations."   (TR 27-28).   The
18 ALJ found plaintiff's allegations "less than fully credible," a finding
19 that is not challenged here, and, in any event, is supported by the
20 record.   As the ALJ observed, during a consultative examination by
21 psychiatrist Dr. Mirkovich, the doctor noted that plaintiff gave "poor
22 effort" during testing of her intellectual functioning and sensorium.
23 (TR 353).   Plaintiff also ceased cooperating and left before the testing
24 was completed.   (TR 354).   The failure of an individual to cooperate or
25 use full effort during consultative examinations supports an ALJ's
26 determination as to that individual's lack of credibility.   See Thomas
27 v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).   The ALJ additionally
28

observed that plaintiff over-endorsed symptoms and was inconsistent in her self-reporting. (TR 23-25). Examining psychiatrist Dr. Mirkovich noted that plaintiff "can be inconsistent and dramatic in her symptoms. She is over-endorsing symptoms." (TR 353). Plaintiff told Dr. Mirkovich that she could not use a computer due to glaucoma, yet her optometry records indicate that she has corrected 20/20 vision and her mild glaucoma is controlled with eye drops. (TR 23, 298, 348-50, 353, 868). Plaintiff testified that her asthma kept her from working, yet she smoked cigarettes. She denied smoking cigarettes during a consultative psychiatric examination. (TR 23-24, 420, 687-88, 692-93, 839). When self-reporting to different doctors within a two-week period plaintiff both claimed to experience hallucinations (TR 368) and denied experiencing hallucinations (TR 358). (TR 25). Dr. Kamath's reliance upon plaintiff's subjective reporting is another legitimate basis for the ALJ's rejection of Dr. Kamath's opinion. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ may reject physician's opinion premised upon plaintiff's subjective complaints where ALJ properly discounted plaintiff's credibility).

Examining physician Dr. Wind performed a consultative examination of plaintiff in June 2005. Dr. Wind took plaintiff's medical history as she reported it, performed a physical examination, and produced a written summary and functional assessment. (TR 858-62). Dr. Wind emphasized that she was hampered by the absence of medical records: "I do not have any x-rays, laboratory tests, nerve conduction studies, or any data of that nature to review. The entire history is obtained from [plaintiff]." (TR 858). Dr. Wind's examination of plaintiff yielded no significant abnormal clinical findings, other than the observation that

plaintiff had a broad-based waddling gait due to her obesity.   (TR 859-61).   The ALJ declined to give Dr. Wind's assessment of plaintiff's limitations weight because "it is based upon [plaintiff's] subjective and less than credible allegations as Dr. Wind noted that she did not have medical records or test results upon which to base her opinion." (TR 26-27).   As previously discussed, the ALJ's negative credibility finding regarding plaintiff is a finding that is not challenged here and is supported by the record.   Dr. Wind's reliance upon plaintiff's subjective reporting is a legitimate basis for the ALJ's rejection of Dr. Wind's assessment.   See Tonapetyan v. Halter, 242 F.3d at 1149 (ALJ may reject physician's opinion premised upon plaintiff's subjective complaints where ALJ properly discounted plaintiff's credibility).

In sum, the ALJ's rejection of the opinions of treating physician Dr. Kamath and examining physician Dr. Wind was supported by substantial evidence and free from material legal error.

B.   Mental Impairment (Issue 2)

Plaintiff asserts that the ALJ erred by finding her mental impairment to be non-severe.

A severe impairment or combination of impairments is one that significantly limits the physical or mental ability to perform basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).   Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting.   20 C.F.R. §§ 404.1521(b), 416.921(b); Bowen v. Yuckert, 482 U.S. 137, 141-42 (1987).   The Ninth Circuit has defined the step-two inquiry as a "de

1  minimis screening device to dispose of groundless claims." Edlund v.
2  Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) (citation omitted).

3  Once the Commissioner determines that a mental impairment exists,
4  the Commissioner must then evaluate the degree of functional loss it
5  causes by rating plaintiff's level of functional limitation in four
6  areas:  (1) activities of daily living; (2) social functioning; (3)
7  concentration, persistence, and pace; and (4) deterioration or
8  decompensation in work or work-like settings.  If an individual's
9  limitations are rated as mild in the first three areas and the
10 individual has had no episodes of deterioration or decompensation, the
11 mental impairment will normally be found to be not severe.  20 C.F.R. §
12 416.920a.

13 Without performing any mental status examinations or psychological
14 testing, Dr. Kamath, plaintiff's primary care physician, diagnosed
15 plaintiff with major depression.  Dr. Kamath prescribed the medications
16 Prozac, Risperdal, and Ambien.  (TR 23, 312-13, 323-24, 352, 359, 368,
17 439, 451, 484, 535, 837-38).  Dr. Kamath's records and plaintiff's
18 testimony at the hearing indicate that at times plaintiff chose to go on
19 and off medication.  (TR 550, 695).

20 The ALJ determined at step two of the sequential evaluation that
21 plaintiff did not have a severe mental impairment.  The ALJ stated in
22 his decision that "due to the lack of documented mental limitations,
23 [plaintiff] is found to have mild restrictions of activities of daily
24 living, mild difficulties maintaining social functioning, and mild
25 difficulties maintaining concentration, persistence and pace.
26 Therefore, her depression is not a 'severe' impairment."  (TR 25).

27 In making this determination the ALJ relied upon the examination
28

findings of board certified psychiatrist Dr. Jacobs (who performed a consultative psychiatric examination of plaintiff on July 17, 2005, summarized in a written report), psychiatrist Dr. Mirkovich (who performed a consultative psychiatric examination of plaintiff on May 31, 2003, summarized in a written report), and psychiatrist Dr. Arella (who met with plaintiff on May 20, 2003, summarized that visit on June 2 by filling out a mental disorder questionnaire form, and saw plaintiff once more on June 3 and summarized that visit by filling out a progress report form).  (TR 23-25, 351-64, 837-41).

Upon mental status examination by board certified psychiatrist Dr. Jacobs in July 2005 plaintiff was alert and oriented, with intact memory (immediate, recent, and remote).  Plaintiff's thought processes were linear, logical, and goal directed.  Plaintiff's judgment was fair and her insight limited.  Plaintiff was able to perform serial seven subtractions and follow a three-step command.  Plaintiff related that she cared for her nine-year-old son and managed her own funds. Plaintiff reported that she took Prozac prescribed by Dr. Kamath, but was not receiving treatment from a mental health professional. Plaintiff complained to Dr. Jacobs that she had depression, sadness, anxiety, and memory loss.  Dr. Jacobs observed that although plaintiff's affect was mildly dysphoric, she displayed a capacity for humor. Plaintiff told Dr. Jacobs that psychiatric difficulties did not interfere with her ability to maintain concentration, persistence, and pace.  She claimed that her alleged physical limitations caused an inability to maintain persistence and pace.  (TR 837-40).  Dr. Jacobs diagnosed plaintiff with a treatable dysthymic disorder which could be improved with psychosocial interventions and continued medication, and

noted that "her psychiatric deficits . . . are relatively mild." Based upon plaintiff's performance on the examination and her appropriate interaction with him, Dr. Jacobs opined that she "does have the ability to perform simple and repetitive tasks and even more complex tasks," and that she "could accept instructions from supervisors, perform work activities on a consistent basis and maintain regular attendance in the workplace without any impairment due to a psychiatric condition." (TR 840-41).

Plaintiff complains that the ALJ did not focus upon the assessments of other physicians. "In making a determination of disability, the ALJ must develop the record and interpret the medical evidence." Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003). "However, in interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" Id. (citations omitted). It was reasonable for the ALJ to focus on examining psychiatrist Dr. Jacob's July 2005 assessment, as it was the most recent (two years more recent than the assessments of the other psychiatrists). (TR 24-25, 837-41). It is obvious from the record that the ALJ did consider the assessments of the other physicians mentioned by plaintiff; the ALJ made multiple references to their submitted materials and opinions. (TR 23-25). For example, the ALJ observed that plaintiff "distort[ed] the clinical picture" when examined by psychiatrist Dr. Mirkovich in May 2003, as Dr. Mirkovich's report noted "poor effort" during testing and a cessation of cooperation before testing was completed. Dr. Mirkovich also noted that plaintiff "can be inconsistent and dramatic in her symptoms." (TR 24, 353-54). The ALJ observed that despite this distortion, Dr. Mirkovich found that plaintiff displayed thought

processes which were cohesive, coherent, and organized.  Her mood was sad, her affect full and mood-congruent.  She complained of depression, anxiety, and poor memory.  She reported taking Prozac and Risperdal. She reported daily living activities including driving, caring for herself and her young son, handling household finances, performing household chores and cooking, shopping with her live-in boyfriend, and visiting her adult daughter and mother.  Dr. Mirkovich questioned the validity of plaintiff's purported difficulty accepting instructions and interacting with people in the workplace.  Based on his findings and plaintiff's self-reported activities, Dr. Mirkovich opined that plaintiff "would not have difficulty handling detailed and complex tasks or simple and repetitive tasks."  Dr. Mirkovich concluded that plaintiff "does not appear to have an impairment in her cognition which would prevent her from working on a consistent basis."  Dr. Mirkovich's diagnosis was mood disorder, not otherwise specified, rule out depression, not otherwise specified, rule out anxiety disorder, not otherwise specified.  (TR 23-24, 352-55).

The ALJ observed that in the forms psychiatrist Dr. Arella filled out to summarize plaintiff's first visit to him in May 2003 he wrote that plaintiff was oriented and coherent, that her thought processes were goal directed, that her memory (immediate, recent, and remote) was intact, that her judgment was fair, and that her concentration was only slightly impaired due to distractibility.  Her mood was depressed, her affect was labile.  She complained of depression, anger, insomnia, and variable mood and energy.  She reported taking Prozac.  She reported being able to tend to the needs of her seven-year-old son.  Dr. Arella adjudged plaintiff "able to properly care for personal affairs."  Dr.

14

Arella diagnosed plaintiff as bipolar, depressed. He recommended that she take both Prozac and Risperdal. (TR 24-25, 356-60, 362-64). Dr. Arella filled out a short form to summarize plaintiff's second visit to him in June 2003, noting that her mood was depressed, that her thoughts were clear and coherent, and that she had been advised to take her medication. (TR 361).

The ALJ also reviewed the report prepared by Dr. Ferrell, a nonexamining state agency psychiatrist. Dr. Ferrell's report was based on a review of the documentary evidence as it stood in June 2003. The ALJ gave little weight to Dr. Ferrell's assessment of plaintiff because "there are no objective mental limitations upon which to base [the] conclusions." (TR 25, 372-90).

As previously discussed in connection with issue one, the ALJ properly rejected the opinion of primary care physician Dr. Kamath, who diagnosed plaintiff with major depression without performing any mental status examinations or psychological testing. When plaintiff was seen by Dr. Kamath's associate, Dr. Sri, Dr. Sri merely repeated the diagnosis of major depression in his treatment notes without performing any mental status examinations or psychological testing. (TR 23, 28, 537, 546).

The ALJ's finding that plaintiff's alleged mental impairment was non-severe is supported by substantial evidence and free from material legal error.

<u>CONCLUSION</u>

If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. <u>Flaten v. Secretary of</u>

15

1 | Health and Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995).

2 |     After careful consideration of the record as a whole, the

3 | magistrate judge concludes that the Commissioner's decision is supported

4 | by substantial evidence and is free from material legal error.

5 | Accordingly, it is ordered that plaintiff's motion for summary judgment

6 | is denied, and that judgment be entered in favor of the Commissioner.

7 |     This opinion constitutes the court's findings of fact and

8 | conclusions of law.

9 | DATED: 2/14/08

10 |

11 | CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

16

**22**

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

### DECISION

__IN THE CASE OF__                                          __CLAIM FOR__


Deborah E. Buss                                            Supplemental Security Income
_____                                       _____
(Claimant)

                                                          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
_____                                       _____
(Wage Earner)                                             (Social Security Number)


### INTRODUCTION

On March 19, 2003 the claimant filed an application for Supplemental Security Income payments. The claim was denied initially and on reconsideration, and a request for hearing was timely filed. Following the hearing, the Administrative Law Judge issued a decision dated February 9, 2005 finding that the claimant was not disabled as she retained the residual functional capacity to perform the jobs identified by the vocational expert. The claimant sought Appeals Council review which was granted. The Appeals Council remanded this case to the Administrative Law Judge ordering further evaluation of the opinion of the claimant's treating physician.

Pursuant to this order, the claimant, represented by James Pi, attorney, appeared and testified at a hearing held on August 16, 2006 in Palmdale, California. Harvey Alpern, M.D., a medical expert, and Alan Boroskin, a vocational expert, also appeared and testified.

The claimant filed a subsequent application on March 31, 2005 which has been dismissed.

The general issue is whether the claimant is disabled under Section 1614(a)(3)(A) of the Social Security Act. The specific issue is whether she is under a disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Upon reviewing all of the evidence of record, the undersigned Administrative Law Judge concludes the claimant is not disabled within the meaning of the Social Security Act.

### EVALUATION OF THE EVIDENCE

At her alleged onset date of March 19, 2003, the claimant was 44 years of age and is now 47 years of age, a younger individual. She has a limited education. The vocational expert testified

**EXHIBIT**

that the claimant has past relevant work experience as a sales person (party plan demonstrator) described in the Dictionary of Occupational Titles (DOT) Section 279.357-038 as light and semi-skilled. She alleges that she became disabled on March 19, 2003 due to depression, asthma and a history of arthritis.

In order to determine whether the claimant is disabled, an evaluation must be performed pursuant to 20 CFR § 416.920. At Step One, the Administrative Law Judge finds that the claimant has not performed substantial gainful activity since the filing of her application.

Dr. Alpern testified that the claimant has the medically determinable impairments of hypertension, diabetes, asthma, polycystic kidney with normal renal function, carpal tunnel syndrome by a nerve conduction velocity test, but no records of severe hand problems, and a history of depression. He further testified that the claimant's hypertension, diabetes and asthma are controlled with medication; she has no functional limitations related to her polycystic kidney disease; and she has no severe hand problems related to her diagnosis of carpal tunnel syndrome. The claimant has also been diagnosed with gastrointestinal reflux disease, but has no weight loss, vomiting, melena or rectal bleeding (Exhibit 12F).

At Step Two, the claimant alleges disability due to hypertension, diabetes, asthma and glaucoma. However, she has no complications related to hypertension, diabetes, asthma and glaucoma (Exhibit 8F). The claimant's physician noted that her hypertension, diabetes and asthma are stable (Exhibit 12F/3, /9, /15, /21). The Administrative Law Judge notes that despite having a diagnosis of asthma, the claimant smokes cigarettes (Exhibit 12F/21). The claimant's glaucoma is controlled with eye drops and her corrected vision is 20/20 in both eyes (Exhibit 4F/2, 5F/2). The claimant also has polycystic kidney disease (Exhibit 2F/44). The medical expert testified that her renal function is normal. Her urinalyses have been negative (Exhibit 2F/92, /94, 12F/48). The claimant receives no specific treatment for polycystic kidney disease. Therefore, none of these conditions are "severe" impairments within the meaning of the Regulations (20 CFR 416.920(c)).

The claimant is treated for her depression by Sara Kamath, M.D.., her primary care physician. Dr. Kamath's treating notes are devoid of any mental status examinations, mental evaluations, medication checks or psychological testing. Yet Dr. Kamath has prescribed the psychotropic medications of Prozac, Risperdal and Ambien to the claimant based simply upon the claimant's subjective allegations (Exhibit 4F, 14F, 18F).

Joseph Mirkovich, M.D., a psychiatrist, performed a consultative examination of the claimant on May 31, 2003 (Exhibit 6F). The claimant reported that she had never been suicidal nor had any panic attacks. She also denied visual hallucination, suicidal ideation, homicidal ideation, delusions and paranoia. She complained of poor memory and poor sleep. The claimant stated that she took Risperdal and Prozac.

The claimant alleged that she was unable to use a computer due to glaucoma. However, as noted above, the claimant has corrected 20/20 vision in both eyes. Dr. Mirkovich observed that the claimant was "over-endorsing symptoms" (Exhibit 6F/1, /3). Upon mental status examination, the claimant's mood was sad and her affect full and mood-congruent; and her thought processes


EXHIBIT

were cohesive, coherent and organized. When Dr. Mirkovich attempted to assess her intellectual functioning and sensorium, the claimant gave "a poor effort" (Exhibit 6F/3). The claimant was fully oriented, with an intact memory; but was chose not to complete tests of her abstract thinking, similarities and differences and judgement and insight.

Dr. Mirkovich diagnosed the claimant with a mood disorder not otherwise specified, rule out depression not otherwise specified, rule out anxiety disorder not otherwise specified. He indicated that although the claimant refused to complete serial 7s, she handled her family's finances; is able to care for her son, cook and perform household chores, so would have no "difficulty handling detailed and complex tasks or simple and repetitive tasks" (Exhibit 6F/5). He also noted that the claimant reported good relationships with her mother, daughter, son and companion. Dr. Mirkovich concluded that the claimant had no "impairment in her cognition which would prevent her from working on a consistent basis." He estimated her global assessment of functioning (GAF) at 57. However, he noted that throughout the examination, that the claimant did not put forth her best effort; thereby, distorting the clinical picture.

The claimant visited Salvador A. Arella, M.D., once on May 20, 2003 (Exhibit 7F). Dr. Arella recorded that the claimant's thought processes were goal directed and her memory and judgement were intact. Nevertheless, he diagnosed the claimant with bipolar affective disorder, depressed and estimated her GAF at 50 (Exhibit 7F/9).

On June 2, 2003, Dr. Arella completed a Mental Disorder Questionnaire Form (Exhibit 7F). He noted that he had seen the claimant only once. Dr. Arella reported that the claimant was oriented and coherent with fair memory and judgement and concentration that was slightly impaired by distractibility. He wrote that the claimant is able to "properly care for personal affairs" (Exhibit 7F/3).

Karl Jacobs, M.D., a board-certified psychiatrist, performed a consultative examination of the claimant at the request of the State Agency on July 17, 2005. The claimant complained of depression, sadness, anxiety, anger and memory loss.  TR 837.

The claimant stated that she often lacks motivation. The claimant stated that she was taking Prozac prescribed by her primary care physician. The claimant denied smoking cigarettes, but smokes at least a half pack per day.

Upon mental status examination, the claimant was alert and oriented with intact immediate, recent and past memory. She was able to perform serial 7s and follow a three-step command.

The claimant denied any psychiatric difficulties, but alleged that her inability to maintain persistence and pace was affected by her alleged physical limitations.

Dr. Jacobs concluded that the claimant has a dysthymic disorder. He noted that it is treatable, but the claimant should have psychosocial interventions.

Dr. Jacobs concluded that the claimant has the ability to perform simple and repetitive tasks and more complex tasks; could accept instructions from supervisors, based on her interaction with



Deborah E. Buss (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)

him; perform work activities on a consistent basis and maintain attention in the workplace without any impairment due to a psychiatric condition. He noted that her "psychiatric deficits" "are relatively mild."

Robert T. Ferrell, M.D., a non-examining State Agency psychiatrist, reviewed the evidence and concluded that the claimant's affective disorder caused her mild restrictions of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence and pace and no episodes of decompensation (Exhibit 10F/11). Dr. Ferrell concluded that the claimant retained the residual functional capacity to perform work that entailed one to two-step tasks (Exhibit 9F/3). The Administrative Law Judge gives this opinion little weight as there are no objective mental limitations upon which to base these conclusions.

After reviewing all the evidence, including Dr. Jacobs's July 17, 2005 examination report, John T. Bonner, M.D., a State Agency physician, concluded that the claimant has no severe mental impairment (Consultation Request dated August 23, 2005).

After a careful review of the evidence, the Administrative Law Judge finds, that due to the lack of documented mental limitations, the claimant is found to have mild restrictions of activities of daily living, mild difficulties maintaining social functioning and mild difficulties maintaining concentration, persistence and pace. Therefore, her depression is not a "severe" impairment.

This mental residual functional capacity is supported by the findings of Dr. Farrell, the examinations conducted by Drs. Mirkovich and Jacobs as well as the objective findings of Dr. Arella upon his mental status examination that showed goal directed thought processes and intact memory and judgement. Also, in the medical questionnaire, Dr. Arella reported that the claimant was oriented and coherent with fair memory and judgement and concentration that was only slightly impaired by distractibility; and she reported that she is able to properly care for her minor son and personal affairs (Exhibit 7F). Also, the claimant, herself, stated that her problems were not due to a psychiatric cause.

The claimant alleges a history of arthritis. Granting the claimant significant benefit of the doubt, the Administrative Law Judge finds that this impairment imposes more than minimal limitations upon her ability to perform basic work-related activities. Therefore, it is a "severe" impairment within the meaning of the Regulations. However, its severity does not meet or equal the severity of any impairment contained in the Listing of Impairments at Appendix 1, Subpart P, Regulations No. 4. Thus, the Administrative Law Judge must next decide whether the claimant retains the residual functional capacity to perform her past relevant work. The term "residual functional capacity" is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 CFR 416.945 and SSR 96-8p).

On June 2, 2003, Jagvinder Singh, M.D., performed a consultative examination of the claimant (Exhibit 8F). The claimant stated that she had asthma diagnosed five years previously and used inhalers. However, her last asthma attack had been in January 2003. Upon examination, the claimant's chest was clear. The claimant complained of auditory hallucinations although she denied them to the consultative psychiatric examiners and Dr. Arella.



The claimant was obese at 65 inches tall and 275 pounds. She walked with a normal gait and was able to get on and off the examination table without difficulty. The claimant had 5/5 motor power of all extremities and intact sensory and reflex functions. The claimant's joints had full ranges of motion and were free from deformity, redness and warmth. Dr. Singh noted that while the claimant gave "a history of arthritis in the neck, knees and hands," there were "no physical findings" (Exhibit 8F/5).

After examining the claimant, Dr. Singh concluded that she could lift and carry 50 pounds occasionally and 25 pounds frequently, stand for 6 hours of an 8 hour workday and sit for unlimited periods and "avoid working at extremes of temperature, at heights and [exposure] to fumes, dust and biological and chemical hazards" (Exhibit 8F/5).

X-rays showed that the claimant had moderate degenerative changes of the thoracic and lumbar spine. However, Dr. Kamath did no follow up examination neither did she perform straight leg raising tests or any other tests to arrive at her conclusion that the claimant has lumbar radiculopathy. Despite Dr. Kamath's opinion that the claimant has lumbar radiculopathy, objective electrodiagnostic tests show that the claimant has no radiculopathy of the lower extremities (Exhibit 14F/12).

The claimant was diagnosed with bilateral carpal tunnel syndrome by NCV on December 1, 2003 (Exhibit 14F/16). However, the record contains no evidence of treatment for this condition; and surgery has not been recommended.

Norman J. Rubaum, M.D., a non-examining State Agency physician reviewed the evidence and concluded that the claimant could perform medium work that would allow her to avoid all exposure to dusts, gases, poor ventilation and other pulmonary irritants (Exhibit 11F/5).

On June 23, 2005, Rebecca Wind, M.D., performed a consultative examination of the claimant at the request of the State Agency. The claimant complained of low back pain due to obesity and aching of the knees and ankles. Although the claimant's lungs have been clear upon examination, the claimant alleged a history of chronic asthma. She claimed numbness and weakness of her left hand due to carpal tunnel syndrome; but had 5/5 motor power of both hands.

The claimant alleged that she had an asthma attack the day before the examination. However, as upon prior examinations, her lungs were clear to auscultation. The claimant's gait was broad-based and waddling due to obesity, but she was able to tandem walk and walk on her heels and toes. Her straight leg raising test was negative. The claimant's joints were free from effusion with full ranges of motion and full 5/5 motor power. The claimant's sensation and reflexes were normal.

Dr. Wind opined that the claimant could walk for 60 to 90 minutes at a time, then rest for 20 minutes at intervals up to 4 to 6 hours per day; sit for 60 to 120 minutes, then rest for 20 to 30 minutes for up to 6 hours per day; lift and carry 20 pounds occasionally and 10 pounds frequently; occasionally climb, balance, stoop, kneel, crouch and crawl and push/pull due to obesity; should not perform repetitive gross and fine manipulation; and avoid working at heights.

EXHIBIT

The Administrative Law Judge does not give this assessment weight as it is based upon the claimant's subjective and less than credible allegations as Dr. Wind noted that she did not have medical records or test results upon which to base her opinion.

After reviewing the evidence, including the report from Dr. Wind's consultative examination of June 23, 2005, John T. Bonner, a State Agency physician, found that the claimant retained the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours of an 8 hour workday, sit for 6 hours of an 8 hour workday, has no limitations upon the ability to push/pull, should never climb ladders, ropes and scaffolds, occasionally stoop and crawl, has limited handling and fingering ability, and should avoid concentrated exposure to extreme cold and hazards. The Administrative Law Judge does not give this residual functional capacity significant weight as it is overly restrictive in light of the objective medical evidence of record.

Dr. Alpern, the medical expert carefully reviewed all the evidence, including the claimant's testimony, and concluded that the claimant retains the residual functional capacity to perform work that would require her to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk each for a total of 6 hours; occasionally climb, balance, stoop, kneel, crouch and crawl; work that would not expose her to concentrated noxious fumes; work that would allow her to alternate sitting and standing; and, work that prophylactically due to her diagnosis of carpal tunnel syndrome, entails limited to occasional gross and fine manipulation.

The Administrative Law Judge gives weight to the assessment of Dr. Alpern as he has had the opportunity to review all the evidence of record, including evidence not available to the State Agency physicians. The claimant's morbid obesity was taken into account in limiting her postural movements to occasional (SSR 00-2p).

The undersigned has considered all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR § 416.929, and Social Security Ruling 96-7p. The undersigned has also considered all medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 CFR § 416.927 and SSRs 96-2p and 96-6p).

Dr. Kamath, the claimant's primary care physician, submitted notes on prescription pads stating that the claimant was disabled (Exhibit 14F/1, /9). She also completed several residual functional capacity assessments indicating that the claimant is unable to perform work on a full time basis. However, Dr. Kamath did not set forth any disabling limitations and these assessments are not supported by her treatment notes. Moreover, the conclusion of disability is reserved to the Commissioner. Therefore, the Administrative Law Judge gives Dr. Kamath's opinion no weight.

Dr. Kamath's treating notes are simply recitations of the claimant's subjective allegations (Exhibit 4F, 12F, 14F, 21F). While diagnosing the claimant with arthritis, Dr. Kamath's treatment notes show that she has not performed any joint inspections, range of motion testing or manual muscle testing. The claimant alleges arthritis of the left shoulder and hip, but x-rays are


EXHIBIT

negative (Exhibit 12F/22, 14F/19). Dr. Kamath treats the claimant for depression, but the record shows that she has never performed a mental status examination or medication check. Dr. Kamath says that the claimant's asthma is disabling, yet in her treatment notes, she characterizes it as stable. Upon examination by Dr. Kamath, the claimant's lungs have been clear except on November 24, 2004 when she visited T. Sri, M.D, an associate of Dr. Kamath, to "get letter for disability" (Exhibit 21F/13). She had a few rhonchi. Dr. Kamath states that the claimant's glaucoma, diabetes and polycystic kidney disease are disabling, but Dr. Kamath records no limitations imposed upon the claimant by these impairments. The objective medical evidence of record shows that the claimant has no limitations related to glaucoma as she has corrected 20/20 vision, her diabetes without end organ damage is stable per Dr. Kamath's treating notes and the medical expert testified that laboratory tests show her kidney function is within normal limits. Dr. Kamath's stated limitations are so out of proportion to the objective findings that they cannot be credited (20 CFR § 416.927(e) and SSR 96-5p).

The claimant's attorney asked Dr. Alpern about the rest periods Dr. Wind stated the claimant would need throughout the workday. Dr. Alpern testified that these rest periods are not realistic. A sit/stand opinion would be appropriate as there is no basis to assume that there should be some rest periods. The attorney asked the medical expert what impact the use of a nebulizer machine would have upon the claimant's residual functional capacity. Dr. Alpern responded that there is no documentation that there is a need for a nebulizer machine. The attorney asked the medical expert whether the number and combination of the claimant's medications cause side effects or drowsiness. Dr. Alpern replied that there is no documentation that she experiences drowsiness or sleepiness from these medications. Moreover, the Administrative Law Judge notes that the claimant specifically denied medication side effects (Exhibit 12F).

The claimant's allegations are less than fully credible. Dr. Mirkovich noted that the claimant was "over-endorsing symptoms" (Exhibit 6F/1, /3). The claimant told Dr. Singh that she lives with her young son and boyfriend. She has no problems with personal grooming and is able to drive, cook and do household chores (Exhibit 8F/2). The claimant reported that she sits in her "recliner most of the day and cry" (Exhibit 12E/3). X-rays and Dr. Singh's examination did not reveal arthritic changes of any joints, yet the claimant alleges arthritis that greatly limits her activities.

The claimant testified that she cannot work due to back pain, asthma and polycystic kidney disease. An MRI showed moderate degenerative changes of the thoracic and lumbar spine. However, electrodiagnostic tests ruled out radiculopathy. She has 5/5 motor power of all extremities and intact sensory and reflex functions. Despite the claimant's allegations of arthritis, her joints have full ranges of motion and are free from deformity, redness and warmth. X-rays have been negative. She alleges problems with asthma, but when examined, her lungs have been clear. The claimant alleges pain in her right kidney, but has normal kidney function. Therefore, the Administrative Law Judge finds the claimant's allegations of disability less than fully credible (20 CFR § 416.929 and SSR 96-7p).

The claimant testified that she lives with her minor son, but her only chores are getting her son off to school and washing dishes. She claims that her daughter comes and does her household chores for her. She stated that she drives only if she cannot have her mother drive her. She



stated that she passes the time of day by watching television "and that is about it." She lies down five times daily for up to two hours; yet complains that she does not sleep well at night.

In a Third Party Questionnaire, the claimant's boyfriend reported that the claimant gets up at 7:00 AM and gets her son ready for school, drives him to school and helps him with his homework when he comes home. Despite her report to Dr. Singh that she performed dish washing and household chores, her boyfriend reported that he did the dishes and cooks. The claimant told Dr. Singh that she had no difficulty with personal grooming. However, her boyfriend alleged that he has to brush her hair and sometimes her teeth. He claimed her "eyesight is bad," and she has difficulty reading, but examinations have shown that she has corrected 20/20 vision. As this questionnaire conflicts with the objective medical evidence of record as well as the claimant's own reports, the Administrative Law Judge cannot credit it.

Based upon the claimant's residual functional capacity, the Administrative Law Judge must determine whether the claimant can perform her past relevant work. The phrase "past relevant work" is defined in the Regulations at 20 CFR § 416.965. The work usually must have been performed within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity.

The vocational expert testified that the claimant cannot perform her past relevant work as it requires frequent handling and fingering. Once the claimant has established that she cannot perform her past relevant work because of her impairments, the burden shifts to the Commissioner to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with her residual functional capacity, age, education and work experience.

The claimant's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile.

The Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any non-exertional limitations. Based upon the claimant's residual functional capacity, she is capable of performing a significant range of light work as defined in 20 CFR § 416.967.

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. If someone can do light work, we determine that she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods.



If the claimant were capable of performing the full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines. The claimant's ability to perform all or substantially all of the requirements of light work is impeded by additional exertional and/or non-exertional limitations. An impartial vocational expert was used to help determine whether or not there are a significant number of jobs in the national economy that the claimant can perform given her residual functional capacity and other vocational factors.

The Administrative Law Judge asked the vocational expert whether work exists in the national economy that could be performed by an individual limited to light work that would require her to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk each for a total of 6 hours; occasionally climb, balance, stoop, kneel, crouch and crawl; should be restricted from concentrated noxious fumes; should be allowed to alternate sitting and standing; and, prophylactically, due to her diagnosis of carpal tunnel syndrome, be limited to occasional gross and fine manipulation and has no transferable skills. The vocational expert testified that the hypothetical individual could perform the representative light, unskilled occupations of information clerk DOT § 237.367-018 (10,100 national jobs, 540 local jobs); and counter clerk photo processing DOT § 249.366-010 (56,000 national jobs, 1,900 local jobs). The vocational expert testified that in the photo processing job the employee is not exposed to noxious chemicals as the chemicals are self-contained. The Administrative Law Judge finds that these jobs exist in significant numbers in the national economy.

The claimant's attorney asked the vocational expert whether the above-described individual could perform any work in the national economy if there was a marked limitation in the ability to interact appropriately with the general public. The vocational expert replied that there would be no jobs. However, the only reason the consultative examiner placed this restriction was due to the claimant's subjective allegation that she had difficulty with social interaction – not due to the findings of the examiner.

Giving weight to the testimony of the medical and vocational experts, the undersigned concludes that considering the claimant's age, educational background, work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore reached within the framework of Medical-Vocational Rule 202.18.

For all the foregoing reasons, the Administrative Law Judge concludes that the claimant retains the capacity for work that exists in significant numbers in the national economy and has not been under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:



1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has severe impairments.

3. The severity of these impairments does not meet or equal the severity of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not credible for the reasons set forth in the body of the decision.

5. The claimant retains the residual functional capacity to perform light work that lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk each for a total of 6 hours; occasionally climb, balance, stoop, kneel, crouch and crawl; work that would not expose her to concentrated noxious fumes; work that would allow her to alternate sitting and standing; and, work that prophylactically, due to her diagnosis of carpal tunnel syndrome, would require limited to occasional gross and fine manipulation.

6. The claimant is unable to perform her past relevant work (20 CFR § 416.965).

7. The claimant is a "younger individual" (20 CFR § 416.963).

8. The claimant has "a limited education" (20 CFR § 416.964).

9. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

10. The claimant retains the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

11. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include the representative light occupations of information clerk and counter clerk photo processing. The Administrative Law Judge finds that these jobs exist in significant numbers in the national economy.

12. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).



## DECISION

It is the decision of the Administrative Law Judge that, based on the application filed on March 19, 2003, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.


_Jan Donsbach_
Jan Donsbach
Administrative Law Judge

_____
Date


EXHIBIT